Base number 152063, Edwin Segner v. Township of Salem. Others, General Arkansas receives 15 minutes per side. Vow for the appellant. Sad to say, there are not a lot of people waiting to hear this argument. Everybody's left. Only the most important three, I hope. Yeah, exactly. Yeah. May it please the court, Raymond Gazelle on behalf of the appellant, Mr. Segner, I have reserved four minutes for rebuttal. Great. The facts of this case are that Firefighter Bellinger testified that Supervisor Whitaker is a racist. He used the N-word. He participated in racial comments. And the testimony is that he did not like to admit it, but there was a hefty amount of racial slurs, and they were going to sensitivity training as a whole fire department. What does that go to? Well, I think it goes to the discriminatory atmosphere. And I think we've cited to the case law indicating that. It's not a hostile work environment claim, or it is a hostile work environment claim? I don't believe it's a hostile work environment claim. It's that there's a retaliation and a discrimination claim. Well, the discrimination is what you want to amend it to, right? Correct. Correct, Your Honor. You don't have a discrimination claim. Correct. We've asked that the court— It's the claim you wanted to amend after the close of discovery. The race discrimination claim. Right. Correct. And the judge ruled it was untimely because discovery had already occurred. It would have to be reopened, and the depositions would have to be all retaken. How is that an abuse of discretion? Well, I think we've clearly cited in here that the magistrate judge stated that because of the delays of the defendants in this case, they pushed these— we noticed up to depositions in 2014. They didn't allow us depositions until 2015 in April, right to the end of the close of discovery. So within 30 days of discovering that the testimony was that Mr. Whitaker is a racist, and within 30 days of discovering that it was Mr. Whitaker who pushed through Mr. Rockwell as the fire chief, then we filed to amend the complaint because we didn't have the evidence of race discrimination, as an attorney, I felt, to proceed prior to. I thought you alleged race discrimination in 2010 in the EEOC complaint. Am I incorrect on that? Well, not myself. That was Mr. Signer. I don't care, but your client did. My client did. Yeah, I didn't become involved until much later. Okay, so your client in 2010 claimed that there was race discrimination going on in the fire department, and somehow then he claimed later that he didn't know about it? That's not correct. It wasn't that it was going on in the fire department. He claimed that he believed that he was discriminated against based upon his race. Well, that's kind of what he would have to do if we allowed his complaint to be amended. He wouldn't recover because of general race discrimination going on in the fire hall. He would have to show that he himself was discriminated based upon his race, right? Correct. That's what he alleged in 2010. We didn't have this evidence. Okay, you didn't have this extra evidence, but obviously he had some evidence, or I don't think he would make a false statement in 2010. No, I think what the delineation is is his belief. Just because somebody believes something to be true doesn't make it true and doesn't give us enough evidence to always proceed in court. If I'm correct, if I can file on beliefs, I'll file lawsuits all day long. You say his EEOC complaint had no substantive basis in 2010. That's not even close to what I said. I said that was his belief. I wasn't involved in the 2010. You're going over facts. We're talking about prejudice to your client, not to you. Sure. And whether he goes through two attorneys, three attorneys, four attorneys, we're adjudicating his rights. Sure. Everybody was entitled to an interview. My client was not given this job interview in 2012. He filed a letter with the township stating that he believed it bordered on racial discrimination. Is there a rule, a regulation, that everybody is entitled to an interview, or is that just custom or practice? No, that was specific testimony by Mr. Whitaker, which we cited. I mean, was there anything that required them to give everybody an interview? I don't know how to answer that other than that was his testimony. He said everyone is entitled to an interview in the township. Well, okay, it sounds like a legal conclusion by a lay witness, and I don't think he's got a foundation for a statement. Okay. He believes that everybody is entitled to an interview, but what's the basis for your opinion? He didn't say it was his belief. He stated it as a fact. Well, what's the basis? I mean, okay. He was the supervisor of the township. The basis of his fact was him working as the supervisor of the township, and his testimony illustrates that all of these other people who came through were entitled to an interview, as my client was, but he did not get the interview. My client's application was incomplete. Do you contest that? It was missing page three. Well, we do contest that because of the fact that Mr. Bellinger said that there were all types of errors within the process. As to whether your client's application was incomplete, do you contest it or not? I can't answer any better than I just did. You didn't answer my question. You have to admit you want to do a confession and avoidance answer here. The confession is that it was incomplete. The avoidance is that there were other people who had incomplete applications. You have to acknowledge it was incomplete. Are we going to fight about that? As I understand the testimony, my client testified, as I understand, that he believed he put in a complete application, but his page three came up missing. Now, whether they ended up messing it up and not putting it in there, I don't know the answer to that question. But I do know that they argued it's incomplete. There's record evidence that your client testified by affidavit or deposition that he filed a complete application. If so, where can I find it in the record? That's my recollection. You don't know what the record says as to that? It seems like a rather important point. I don't think that it is. You don't think it's an important point or you don't think it's in the record? I don't think it's a relevant, important point because of. . . You don't know where it is in the record or if it's in the record? If I can finish, please. You could just answer my question. I'm trying to. It's because of what you've argued here today, which is that they were both incomplete. Their argument is his was incomplete. There was another one that was incomplete as well. But, I mean, Judge Griffin's asked a fair question here. It's been briefed. It was part of the district court decision. And if you're going to say it's wrong, it does seem fair to ask you to show us in the record where your position is supported. So let's just start with the first point. Was the application incomplete, missing this third page? And so if your answer is, well, actually, that's a disputed fact, here's what my client said. Just tell us where that is because that's a pretty fair question to expect to be able to answer right now. So can you answer that question? Not any better than I just did. Tell me, do you know where it is in the record where it says that he. . . Your position is he said he submitted a complete application? That's my recollection. That's my recollection. You don't know where in the record. . . I would have to siphon through the 300 pages of testimony transcript to look it up again. All right. It always helps if you're prepared for oral argument and know the record. Well, I think that I am, but not on that specific issue because I don't think it's a specific issue. It's a rather important issue if you say that he was entitled to an interview and I submitted an application that entitled me to an interview, and the other side's response was, no, we only interview people that submit qualified, complete applications, and we rejected it because it was incomplete. And now you don't know if that defense is true or not. Those aren't facts of this case. Let's talk about the district court. Did the district court assume that your client's application was incomplete? Well, the district court assumed a lot of things in opposition to the actual facts in this case. That specific fact I don't recall, and we're spending a lot of time on this point, but I can only explain to you that the reasoning is that because they're claiming my client's was incomplete and there was another application that was incomplete, then the testimony is they would have to disqualify both. But there was no policy in effect as to disqualifying applications, which was a false fact relied upon by the trial court. The trial court said, oh, there's this policy. When we cite it to the specific facts, the specific testimony of Mr. Heil, it says there is no such policy. So if there's no policy... I don't mean to interfere, but if we could just quickly go to the motion to amend, and then we move to any other things you have. So the judge said that you were untimely. You filed a motion after discovery was closed. I think the summary judgment motion was filed right in that context. And you say that the reason you didn't move before was because you didn't feel you had enough to do that. And then the response of the opposing counsel was that, and I think the court, that there was information that you had. You had an EOC charge in 2010, but there was also one in 2013. And in the EOC charge, retaliation was listed, but also race discrimination. And then there were a number of instances along the way where a plaintiff had indicated that the township discriminated against Asians. And so they go through like three or four or five things. And just to summarize, your argument is, but you just didn't think you had enough. There was claims in deposition by your plaintiff that he'd been discriminated against. There were other indications that he said he was being discriminated against. But your argument is you had to have more before you felt that you could file that, and you didn't have that until the late date that you sought to file the motion. Is that your argument? Absolutely correct. I've seen a million cases dismissed. I just wanted to know, okay, and then we would go to the, and then the judge also said that even if you had filed, it would have been futile. And that's, so then the second one goes to the issues that you did have in regard to retaliation. And I guess the question is, although your time is almost up, what is the fatal error there by the court as you view it? What's your best argument? If we listen to it, we're going to realize, yeah, the district court really made a mistake on this. Well, there's, the trial court relied upon the false fact of defendants at page 5 of their brief stated that Heil testified there was a policy to eliminate incomplete applications. Heil testified there was nothing, and that only one time the township eliminated an incomplete application regarding commercial bids at page 125 of his transcript. His testimony was there was no policy in determining employment applications at the township in terms of whether they're complete or not. That is at page 126 and 127 of his testimony. So that was contextual would basically be your argument. They were retaliating. The explanation they gave is pretext because there was no policy and they'd allowed other people to apply. Absolutely. Incomplete applications. Well, the other person that applied for this job, their answer was, well, we've been working with him, so we already knew the information we needed. I made those recommendations. Whereas with your client, the missing page had the driver's license information, which I guess they would have needed to check to make sure he could qualify. They had all that information, too, because he worked there for 15 years. And they had his driver's license information? Yes. The testimony was all in there that they had all that information, just like they had of the other employee who had worked there for 15 years. Certainly. But the fact that Defendant Rockwell was told days before the board meeting, voted to give him the position, illustrates pretext, and the fix was in. How else would Rockwell have known that information? He was told. And he told other firefighters, I'm going to be the fire chief two days before. That may be a due process violation, as someone pointed out, but does that mean, since there were other applicants as well, is there any sense that your client was so qualified above and beyond the others that they really were doing that to preclude him from getting the job? Well, I don't think issue of qualification is the key factor. The key factor is he's entitled to an interview, and when he doesn't get the interview, that's the adverse employment action, period. That's it. I mean, you have to show he would have had a chance to get the job, right? I mean, otherwise it's a harmless error. Well, Mr. Bellinger testified, and my client testified, that he had more experience and he'd worked there longer than Rockwell. So he did show that he had more experience and more time on the job. Absolutely. What do we make of the fact that his, I don't know quite how to put it, you might characterize his application as a little sanctimonious or maybe not very respectful? Well, he was. Saying, you know, why are you applying? Because, well, I'm going to straighten things out and justice will be done. People don't usually react very kindly to that. Imagine a judge getting an application from a law clerk. Why do I want to work for you? I can straighten things out. You're so bad. Most people don't respond well to that. I don't disagree with that. My client was very upset that he wasn't given the time to be interviewed. But the bottom line is all the township had to do was say, you know what? Okay, we're going to give you the interview. And then give him the interview. But the fact that the interview process was fixed throws this into a whole other tailspin because the interview process wasn't on the up-and-up anyway. It was Whitaker who told Heil, convinced Heil, and said, Mr. Heil, I want you to hire Rockwell. And so two days prior, the evidence is that Rockwell goes around and says to a couple of firefighters, I've got the job. I'm going to be the fire chief. Pretext all the way around. You'll get your full four minutes rebuttal. We'll hear from Ms. Rae O'Donnell. May it please the Court. Good morning. My name is Elizabeth Rae O'Donnell, and I am representing Salem Township and the trustees in this matter. And I thank you for this opportunity. My theme would be, on behalf of my client, no one ever said that the plaintiff wasn't a good firefighter. They didn't interview the plaintiff because his application was not complete. Mr. Heil. It doesn't seem likely that they would have had his driver's license information. Excuse me? It does seem likely that they would have had the information that was ostensibly on the missing page. In other words, his driver's license information. How could you not have that if he'd been loyal? That could be. But when you're an applicant and you're trying to put your best foot forward, usually you do fill out the entire application and you turn it up. And you have the other applicant that got the interview and had an incomplete application. That, Your Honor, I think you have to look at the two applications together. Mr. Rohrhoff, he was the interim chief, and he had been with the department for quite a while. The board was familiar with his job performance. And really, if you look at the two applications qualitatively, Mr. Rohrhoff included his certifications, his background, his fire experience, his training. That was all missing from the plaintiff's application. And as the court indicated earlier, it was sort of sanctimonious or almost a political expression that he wanted to see justice prevail. And he didn't include his qualifications and his skills to show that he was a leader. And that's what the... But am I right that the explanation by the defendants for the no interview is the incomplete application? Or is it several things? Yes. It would be that. I agree with you. Something about the signature, too, wasn't it? There was something about the signature. Personally, I find that less of a compelling argument in this case. I really think the compelling part of the argument, it wasn't a complete application, and it didn't have his qualifications. Getting back to the argument the other side made, that he was... they had a duty to interview everybody, and he's entitled to an interview. Do you agree that everybody that applied was entitled to an interview? No, I don't agree with that assertion. Usually it's discretionary. It is discretionary. Even if you've done it in the past. Absolutely. And the plaintiff's counsel is pointing to Mr. Whittaker's testimony in this case where... And keep in mind, Mr. Whittaker represented the new administration. Mr. Whittaker, whom counsel... He wasn't the supervisor at this time. He was not the supervisor. I don't know. Did he have a role? What was his position in the fire department? Mr. Whittaker did not have a position in the fire department. He was running for the new township supervisor. Okay, so he wasn't even involved in the... He was not involved in the interview process at all. Not in the process, but he was involved before the process. He was. But him stating his opinion as to who has a legal right to an interview, he's entitled by law or rule or whatever it is, but he had no formal position to say that, right? That is our position. There's no foundation for that. There's no foundation. And, plus, you have to look at Mr. Whittaker's testimony in total because plaintiff's assertions are slightly taken out of... The strength of his argument is very... It has to be looked at in context because Mr. Whittaker said, well, when my administration came on board, I was interviewing some firefighters, and, yeah, I gave those people all a chance to interview. But that was, again, the subsequent administration that came in, and he couldn't speak on behalf of the practices and policies of the prior, the Heil administration, which was in office from 2008 to 2012. What's your position? I mean, so there's one claim is they retaliated by denying him an interview, and in that context, is the denial of an interview not an adverse employment action, or do you concede it is an adverse employment action? I do not concede that because I don't believe... I mean, in a case where you're never going to get a job without an interview. So put to the side whether everyone gets interviews, put all that other stuff to the side, but hypothetically, no one gets a job without an interview, and assume a set of facts, which is not this case, where it's clear retaliation for protected conduct, and they deny you the interview. I'm pretty struck by the idea that's not an adverse employment action. Well, I'm not going to concede that point because I don't feel that, again, that Mr. Stigner put forth his best application in all of his experience and his qualifications. But that's answering a different question. I understand. If the court were to... White says the test would the action the employer took potentially lead other employees to hold back. Would it affect the conduct of other employees, a reasonable employee? Boy, that seems self-evident to me. If you do something, you'll never be able to interview, i.e., never have a chance at a certain promotion. How could that not affect other employees? Well, I can't concede your point, but if I were going to, then you have to get to the next test under McDonnell Douglas, and there's certainly no causal connection that's been established in this case that the EEOC complaint that the plaintiff filed in 2010 really had anything to do with the fact that he didn't turn in a complete application. That is one of the arguments. Correct, that's the Clark case. The 2010 EEOC complaint, it was two years prior to the application for the fire chief in this particular case that we have going on. There was no temporal proximity pursuant to the Clark case that we've cited in our brief. You would also, I think, then clearly make an argument that the other basis cited for retaliation was when the new chief talked to him about the 20% rule and the fact that he wasn't meeting that and talked to him about how to go about doing that. You would certainly say then that wasn't adverse action. I would definitely say that is not adverse action because the testimony is clear that not only was the plaintiff given that memo, but four out of five other firefighters were given that memo as well. And then there was some discussion at the fire hall that this was not pursuant to the collective bargaining agreement, and there was an agreement worked out where the 20% requirement was not, in effect, required. And there was no discipline, no demotion. The plaintiff suffered no adverse effect from that initial memo. And it wasn't just directed to the plaintiff. It was directed to other persons. Other than the two things you just discussed, do you read the plaintiff to advance other arguments with respect to retaliation, other ways in which he was retaliated against based on the 2010 EEOC charge? He has put forth a twin argument. The one would be the 2010 EEOC charge, and the second would be the 2013 EEOC charge, where then he's saying that the chief, Chief Rockwell, retaliated against him for not reaching the 20%. And that's it? You don't see any other? Those are the arguments? Well, he alleged in his appellate brief that the September 20th letter, that the board did not consider him because of that letter. And that was really the first time on the appellate brief that that argument has been fleshed out, and it wasn't really dealt with in the lower court. Was it made in the lower court? It was referenced not in terms of argument, no. I don't believe it was. And in terms of other issues, one of the first issues that the court addressed is whether or not the trial court denied the amendment. And we submit that race discrimination was articulated early in this case. It was mentioned in the complaint in one of the paragraphs, I believe paragraph 59 it was, although the plaintiff's counsel wasn't involved in 2010. Race discrimination. Race discrimination is mentioned in this complaint? I believe it's mentioned in one of the paragraphs. What does it say? I think it references the EEOC complaint from 2010. Oh, just the historical part? Correct. But it occurred to me, as the opposing counsel said, that it could be, I mean, I'm not saying it wins here, it could be a good argument that you don't just proceed on claims because you feel like you have them. You proceed on them when you feel like you've got sufficient evidence to move forward. That is true, and that is good lawyering. But even the plaintiff at his deposition, which occurred on April 3rd, he mentioned that he had been discriminated against on the basis of his race. And, again, we didn't have the amendment request until after the summary judgment motion had been filed. And we cite the Leary case and the Duggins case for the proposition that it's prejudicial to our clients. We would have to take on a whole other defensive mode and prepare for a race discrimination case. Our whole construct of this case was defending a retaliation case, and that is how we proceeded. So we would have been, as the trial court noted, prejudiced by the addition of this count and the addition of Mr. Whitaker as a defendant as well. The district judge denied the motion to amend on two grounds. One, that it was untimely, but two, that it was futile. Correct. And one thing, I don't know if I've seen a case like this before, that Whitaker has a bias against African-Americans, but the plaintiff is Asian and wants the credit for that. And there is some statement by somebody, maybe it was Ballinger, that they think Asians are too smart. And so, anyway, they would discriminate them because they're too highly intelligent or something or other. But connecting, well, we need to amend the complaint from Whitaker for African-Americans to Asians that are too smart. I'm not sure it connects. I guess that goes to futility. That, Your Honor, I believe goes to futility, and the court covered that very well. The court isolated the testimony of Mr. Ballinger and drew it out in their opinion and talked about the fact that Mr. Ballinger testified that Asians are smarter than the average white man, but then that's my subjective opinion here. He had no facts to back that up. Okay. Whitaker didn't share those comments about Asians? That is not in the record anywhere, Your Honor. Okay. So we're supposed to infer that because Whitaker doesn't like African-Americans, that he must not like Asians as well, I guess. He doesn't like any of them. That is not a Caucasian, I guess? Mr. Whitaker is a Caucasian, correct. There's really, I mean, plaintiff's counsel wants to bootstrap the argument that Mr. Whitaker is a racist, and he says something about a black boy hitching post. He sells antiques at his property. He had that on his property. Mr. Whitaker did say he had the Confederate flag at his property. He had some problems. He said more than that. He talked about what happened at the firehouse, and all of them down there almost gave racist comments, and he joined in. I think that was part of the record. There's no time and context, Mr. Wellington? No, I'm not trying to say you lose your case, but I just wanted to be clear for the record. That is in the record. There's plenty there to suggest that what he had in the garage, whatever, the whipping post and the rest of it, that that was tied to also the fact that down at the fire station that people were pretty free about, at least in regard to African Americans, using racial epithets and so forth. I think the record supports that. Isn't that true? Well, again, there's no time, place, again. I don't care what the place is. Mr. Bellinger couldn't pinpoint anything specifically to Mr. Whitaker, anything that he had said. He said that he was there when those conversations took place. And Whitaker never admitted any of that. I'm sorry? Whitaker didn't admit any of that. He did not, no. Was there ever any comments or talk about Asians? There is nothing in the record, Your Honor. That's the thing. You're grouping everybody who's a potential minority race, I guess, together. So that you're supposed to infer that they're prejudiced against everybody, I guess, except a European Caucasian, which I don't even know what that is. Plano's counsel is trying to group every minority together, and there's no negative comments about Asians in the record. Let me ask you this last question. Again, I'm not suggesting that this undercuts your case, but I was interested, just curious. Are there cases if one had good evidence and you were looking at discrimination against one race, can you ever extrapolate from discrimination against one race to another, or does the law prohibit that and you've got to stay within the race in terms of the cases that you have to allow? I did not see those cases in my research. I'm just curious about that. I wouldn't put them into my brief. All right. Okay. Thank you for your argument. Thank you. We appreciate it. Mr. Puzol? Thank you. You've got four minutes, I think. Sure. In rebuttal, in the testimony in this case, a racist is a racist. Did you have an answer to Chief Judge Oliver's question about whether there's case law out there that says, when the comments are specific to one racial group, that allows the inference that those people would be discriminated against people of another racial group? I don't know that there was anything that specific, but the facts in this case go beyond that issue. Because the testimony of Mr. Bellinger was that I'm not saying, let's see, remarks are derogatory against the African-American black, whatever are just part and parcel of common conversation, and gays, lesbians in front of people that I believe are gay on the department. No reservation. He participates in as much as anyone else, and there's a hefty amount of racial slurs at the department, and they don't deny it, and they're going to sensitivity training. He testified he's a racist. He didn't testify he's only racist against African-Americans. He didn't testify he's only racist against gays or lesbians or any other specific race. But because the trial court said, well, because Chinese or Asian – Gays and lesbians is a race? No, I said there's nothing else in there as to any other races or – I didn't say that. No, I said he didn't specifically mention any other race except African-American and black. Well, it looks like their stereotypes for Asian is that they're more intelligent than the Caucasians, so their stereotypes actually should work to their – you would think to their advantage. Well, there was also a statement by Mr. Whitaker as to a minority applicant for a firefighter where he said we don't need any more of your kind, and that was Mr. Bellinger's deposition at page 44, lines 4 to 16, and page 122, 9 through 14. The comments in the fire hall about this, your client would have known that when he filed the lawsuit in this case, right? No, he didn't know those comments. He was not aware of those comments. He wasn't around the fire hall when any of this happened? No, he did not know that Mr. Whitaker was a racist. How about these general comments we're talking about? I mean, he's in the fire hall. There's no testimony that he did not know that. They must not have occurred that often if they didn't occur when he was there, I guess. They didn't occur around him. What do I do with this possible way of thinking about the case that maybe it is an adverse employment action not to interview somebody, but what if just hypothetically I think there was no chance he was getting this job and that there were nondiscriminatory reasons for him not to get this job, whether where he lives, the way he applied, incomplete application, just whatever it is. What do you do with that case? Because it seems very funny to have a damages claim for not getting an interview when the conclusion is there's no causation connecting the retaliation to not getting the job because, of course, the promotion is what creates damages and all that other stuff. So what do I do with that? In other words, I hypothetically agree with you. The denial of an interview is an adverse employment action, so I'm buying that. But hypothetically I say, but I don't see it on this record that there was any chance he was getting the job. Isn't that a funny? What do I do with that? Well, I think that's additional evidence to show pretext and retaliation. In particular, given the testimony of Mr. Bellinger where he said... So additional evidence of pretext as to not getting the job, is that what you're trying to say? Correct, because of discrimination and retaliation. Because Mr. Bellinger's testimony was at page 193 to 194. Question, this email seems to correspond with your testimony here today that discrimination and retaliation has gone on in Salem Township for some time, correct? And his answer was, I can easily say they would never have hired Ed Signer as chief no matter what he wrote down. It's a fact. So the trial court didn't link those. I get the response. That's helpful. So one way of thinking about it is they link together. It does show causation as to the denial of the job. But if I reach the opposite conclusion, that no, there's some non-pretextual grounds for denying the job, I take it the case is over. In other words, we can still say it was an adverse employment action, but that's not your claim. Your claim was not to seek relief for the denial of an interview. Your claim was to seek relief for the denial of the promotion, right? Both. What's the damages for the denial of the interview? I think technically the denial of the interview is the adverse action, and the denial of the job are the damages, if that's what you're saying. I guess I'm saying, though, doesn't your claim go away if all you have is the denial of the interview, but the court reaches the conclusion there's just no way he could have gotten the job on non-pretextual grounds? I may be wrong. I'm just trying to isolate this point. But that's a question of fact for the jury to decide, and the facts go against. The court can't say, well, we believe because of Mr. Rockwell's resume that he was better suited for the job. The court can't do that because there's no testimony in there that anybody weighed the fact that Mr. Signer, on their side, wasn't as qualified as Rockwell was. But my client testified that he was more qualified than Rockwell, and Mr. Bellinger testified that Mr. Rockwell should have been fired because of what he did and a horrible job. But I am right. It is about the job. I mean, that's where the damages are. Certainly. You're correct. Technically correct. The adverse employment action is the interview, doesn't get the job. Those are the damages. Correct. All right. Well, thanks to both of you for your briefs and argument. We appreciate it. Thank you. Thanks for answering our questions. We'll work through the case. The case will be submitted, and the clerk may recess court.